# WILLIAM GRINTON

## V.

## WILLIAM A. STRONG ET AL., EXECUTORS AND TRUSTEES.

*Contracts—Construction of—Employment of Appellant by Appellee's Testator—To Receive as Part Compensation a Proportion of Profits on Investments of Personal Property—Whether Personal Property Merged in Real Estate, to be Regarded as Personal Property in Fixing Compensation—Extrinsic Evidence in Arriving at Intent of Contract—Partnership.*

In an action based upon a contract entered into between the plaintiff and the defendants' testator, under which the former was to take charge of the testator's business, and receive therefor three per cent of the rents collected, and one-fifth of the net income of the personal capital of every transaction, plaintiff's claim being that the relation of partners was created between himself and testator, and that all real estate which resulted from personal property placed under his management remained, for the purpose of fixing his compensation, personal property, and that he was entitled to one-fifth of its increase in value over its cost, after deducting expenses, in view of the evidence, this court holds that the plaintiff and said testator were not partners; that there was no basis in the contract for the claim that real estate resulting from personal property should still be regarded, as between the parties, as personal property; and that the extrinsic evidence totally failed to support appellant's interpretation of the contract.

[Opinion filed May 20, 1892.]

APPEAL from the Circuit Court of Will County; the Hon. DORRANCE DIBELL, Judge, presiding.

On the 12th of May, 1888, Martin C. Bissell, appellee's testator, died at Joliet, Illinois, leaving an estate valued at $180,000, about equally divided between personalty and realty. Appellant had been connected with Bissell in the management of his capital from the 1st of December, 1868, until the date of his death, a portion of the time under parol agreements and a portion of the time under written agreements. The business embraced the lending of money, deal-

ing in negotiable paper, railroad bonds, tax certificates and investments in real estate and renting the same. In these operations Bissell furnished the capital, and appellant, under the direction, and with the concurrence, of Bissell, attended to the details of trades made, the bookkeeping, drafting of papers, etc. At the time of Bissell's death the business was being carried on under an agreement executed February 8, 1879, which is as follows:

"Article of agreement, made and entered into this eighth day of February, A. D. 1879, between Martin C. Bissell, of the county of Will and State of Illinois, party of the first part, and Wm. Grinton, Jr., of the same place, party of the second part.

"Party of the second part is to look after all the lands and buildings owned by the party of the first part, or in his charge (except the dwelling in which said first party now resides), is to rent the same to the best advantage, to make said rental produce the greatest amount of income, to see that all, both real and personal, property of the first party, is assessed equitably, or as low as other property of the same character in the location of those owned by him; is to collect rents; also to see that all buildings and other property is kept in repair, including such lands and tenements as may be in charge or under control of said first party belonging to others.

"Party of the second part is to do all the private business of the party of the first part that he may request or desire, including all his dealings with whomever he may have business transactions; is to make all deeds, contracts, mortgages, as well as all other descriptions of writing he may wish done; to attend to the collection of all amounts due said first party, whether mortgages, notes, contracts, accounts or other claims. Second party shall, at the solicitation of the first party, go wherever he may direct on his private business, he, the first party, paying all expenses incurred. Party of the second part is to use the personal capital of the party of the first part in all legitimate business transactions such as he shall approve, for the purpose of producing

an income from said capital. The party of the second part is to furnish and keep an office, to be located wherever the party of the first part shall direct. And the party of the first part shall be permitted to occupy a portion of said office, having the privilege of putting a desk and table in the same for his private use. Shall be allowed to pass and repass whenever he chooses to do so. Party of the second part is to keep the books of the first party by double entry, in which each and every transaction that belongs to said first party, including the principal invested, interest, commissions and discounts, all to be kept in separate and distinct accounts, and so entered in the ledger.

"In consideration of the party of the second part's faithful performance of the agreements above specified, he is to receive three (3) per cent on all amounts collected for rents, said rent account to be kept separate from other transactions; is also to receive from the net income of the personal capital one-fifth (1-5) of every transaction, which is to be entered in the proper accounts, said accounts to be balanced on the first of every month, one-fifth of said balance to be charged to party of the first part and credited to the party of the second part; and whenever the party of the second part shall receive any or all of his interest of the net proceeds realized from the transactions before specified, it shall be upon the check of the party of the first part.

"The party of the second part may have the privilege of selling or trading any property of the party of the first part, provided the parties hereto shall agree upon the value of the property under consideration before an exchange is made, and if the property or cash he gets in exchange is worth more than the property given, the party of the second part is to have one-half ($\frac{1}{2}$) of the excess value. Party of the second part is to collect up all transactions made by him, and all losses from any business done by him under this agreement, he shall make one-fifth (1-5) of such good.

"The party of the second part is to enter in books to be provided by the party of the first part, all transactions,

showing the amount and the particulars of each; the party of the second part is not to receive his claim against the party of the first part any faster than it is paid in; then he has a right to it. The incidental business of the office, after paying the expenses, rents, fire, lights, etc., may be divided equally between the parties hereto. The taxes paid on the personal capital employed under this contract, in which both parties have a share of the profits, shall be charged up as part of the expenses, party of the first part paying four-fifths, and party of the second part one-fifth.

" This contract may be terminated at any time by either party giving to the other at least thirty days' notice in writing, of his desire to end this contract.

" In witness whereof, said parties have hereunto set their hands and seals the day and year first above written.

M. C. BISSELL, [SEAL.]

WM. GRINTON, Jr. [SEAL.]

In presence of

H. HURLBUT."

Under this contract appellant undertook the management of Bissell's entire business and had the exclusive control of it, with the concurrence of Bissell, until the year 1881, when one Charles O. Vose, a grandnephew of Bissell, was employed to aid in the management of Bissell's property. From the execution of the contract up to the 12th of May, 1888, a large amount of business was transacted by appellant and numerous investments made. The books had been kept by appellant, and show that at the time of Bissell's death he had overdrawn his account $4,907.89. There were also against him four interest-bearing notes aggregating, principal and interest, $4,510.96.

On the 27th of November, 1888, appellant filed his bill in the Circuit Court of Will County against the executors of Bissell, in which he sets out the above contracts; shows that he entered upon the performance of his duties under it; that he had been, before its execution, for some ten years attending to the leasing of Bissell's real estate and the management of his personal capital, and that on the day of the execution

of the contract (February 8, 1879), a full settlement was had
of all previous business. The bill sets out the nature and
kind of Bissell's personal capital on hand at the date of the
written contract, consisting of cash, notes, bonds and stocks
principally. It is also charged that with such personal es-
tate, or the proceeds thereof, certain real estate was acquired
by Bissell, averring in detail how acquired, the cost thereof,
original expenditures thereon at subsequent intervals, and
rents, if any, derived from such realty. The expenditures
in each case are added to the original purchase price, the
receipts then deducted, and the balance averred to be the
real investment in such property. It is then charged "that
the difference between the investment so remaining in said
real estate and the present value thereof, constitute, and is,
under said agreement, the profit of so much and a certain
part of the personal capital named in said agreement,"
averring the present value. "That under and by the true
terms, spirit and intent of said agreement herein set out as
against the said Bissell in his lifetime, your orator had, and
as against his said trustees so taking and claiming under his
last will and testament, now has an interest in said real estate,
to the extent and value of a one-fifth part of said profit;
that Bissell in his lifetime acquired and held the title to
said real estate, subject to the charge and claim of your
orator in the premises; that the title to such real estate
passed to said trustees in trust, under and by virtue of said
last will, charged with said claim of your orator under said
agreement, and subject to an equitable lien thereon for the
amount thereof, to the benefit of your orator, and thus the
said real estate so continued and now remains."

Substantially the same allegations are contained in the
bill as to each of the fourteen pieces of real estate involved
in this controversy. Similar averments as to increase in
value were made in reference to certain stocks and bonds
held by Bissell at the date of the contract. The bill also
contains the following: "That it was the understanding
and agreement of your orator and Bissell in the transaction
of said business under said agreement, that whenever their

business relationship should terminate, then, in the adjustment of accounts of your orators and Bissell under said agreement, the valuation of the estate in which they were each interested under said agreement should be determined by mutual agreement, if they should be so able to agree, and in the event of such agreement the interest of each in said property be computed upon the basis of such agreed valuation at the date of such agreement, and in the event that the valuation of any such real estate could not be arrived at and determined by mutual agreement, then such valuation should be determined in some other proper manner, and the several interests of the parties computed on the basis of the value then determined; that upon the determination of such valuation in either of the modes above mentioned, Bissell was at liberty to retain such real estate free from any lien of your orator, upon first making payment of his interest thereon under such agreement, computed upon such valuation at the date of the determination, the equitable lien of your orator in and upon said real estate to continue to his benefit charged, and secured until the adjustment or payment to your orator of his full interest therein; that on an accounting had, there would be due complainant, under said agreement, over $10,000, after allowing all just credits. The bill prays an accounting, and that complainant's rights in the premises be decreed with priority, and payment ordered of the amount due him.

The foregoing are the essentials of the bill. It was sworn to by appellant, the oath being that he had read the same, heard and knew the contents thereof, and the same was true in substance and fact as he verily believed.

Appellees answered at length, admitting the execution of the contract of February 8, 1879, but deny specifically the construction put upon the same by appellant, and deny *seriatim* that he was entitled to any share of Mr. Bissell's real estate, or any interest in any increased value thereof, and deny appellant's right to a lien, equitable or otherwise, in any of the property set forth in his bill. Similar denials are in the answer in reference to appellant's interest in any

stocks or bonds, aside from the income thereof. Appellees also filed their cross-bill, bringing in as additional defendants, Charles O. Vose and one Bridget Colbert; averring that these parties had claims upon all, or portions of the real estate involved in the original bill, and that the rights of said parties should be adjudicated in the same proceedings, and their claims be declared void, and clouds upon the title of said trustees to be removed by decree of court.

Vose filed his answer denying the necessity of the cross-bill, or that the cross-complainants were entitled to any relief therein, but admitted that he had a claim upon the real estate described in Grinton's and the cross-bill, and that he had filed his original bill in the same court; insisting that his (Vose's) claim is entirely separate and distinct from either Grinton's or Mrs. Colbert's. Appellant also answered protesting against the necessity of a cross-bill, but admitting that he had claims upon said real estate as set out in his original bill, and insisting that his liens thereon are true, valid and equitable. Mrs. Colbert likewise answered, denying that the averments of the cross-bill affected her interests any way.

Subsequent to the taking of a large portion of the testimony appellant filed an amendment to his original bill, averring, among other things, that he and Bissell, on December 1, 1868, entered into a written agreement to continue for one year on certain terms; that the same continued on the same terms until November 21, 1877, when a full settlement had been made; that at this time he and Bissell made a new agreement, by which the entire personal capital was to come into the business, the same to be transacted on substantially the same terms as the contract of February 8th, which parol agreement was continued until reduced to writing on that date. Averring further that the allegations of his original bill be related or referred back to and include the agreement of November 21, 1877, and the accounting include both agreements.

Appellees denied the allegations of the amendment, and likewise set up the statute of frauds and the statute of

limitations against all matters in the amended and original bill. Appellant's amendment to his bill was not under oath, and was filed against the objection of appellees.

The decree of the Circuit Court was against appellant so far as his claim to the real estate was concerned; also against his right to a recovery under the allegations of his amendment to the bill above noted. An accounting was ordered giving appellant one-fifth of the net income of the personal capital of Bissell, for and during the period between February 8, 1879, and May 12, 1888, after the payment of one-fifth of the taxes and expenses, etc., covered by the contract. It also allowed him an accounting, at the rate of one-fifth of all net rents received from real estate acquired by personal capital after February 8, 1879; an accounting of any interest which accrued after that date, at the rate of one-fifth, which was satisfied by the taking of real estate in satisfaction of any mortgaged indebtedness, and an accounting of the net proceeds of all sales of property, real or personal, belonging to Bissell, over and above the value placed by agreement of him and Bissell, at the rate of one-half of such net proceeds. It is from that decree this appeal is prosecuted.

Mr. GEORGE S. HOUSE, for appellant.

Messrs. HAMLINE, SCOTT & LORD and C. W. BROWN, for appellees.

MR. JUSTICE HARKER. This was a bill by appellant against the executors of the estate of Martin C. Bissell for an accounting and to charge the estate with the value of an interest claimed by him in certain real estate of which Bissell died seized. The suit is based upon a contract, alleged to have been entered into on the 21st of November, 1877, but not reduced to writing until the 8th of February, 1879, whereby appellant undertook the management of Bissell's property and investments. As compensation for services it was provided in the contract that appellant should have

three per cent of all rents collected, and one-fifth of the net income of the personal capital of every transaction. The value of Bissell's property at the time was between $150,000 and $200,000. Something more than one-half was in real estate, located in Joliet chiefly, and yielding a rental income. The remainder was in cash, mortgages, bonds, stocks and other interest-bearing securities. It appears that while operating under the contract a part of the personal capital became invested in real estate, through foreclosure proceedings, execution sales in the enforcement of the collection of debts due, and by direct purchase. The title to such real estate was taken in Bissell and remained in him until his death.

The position assumed by appellant is that the contract created the relation of copartners; that by reason of this relation all real estate which resulted from personal capital placed under his control and management, as between the parties, continued personal property; that as against Bissell, in his lifetime, he had an interest to the extent of a one-fifth in value of the real estate so acquired, over and above its cost, and that such real estate passed to the executors of Bissell's will subject to such interest.

He further claims that there was an understanding between him and Bissell, not set out in the written contract, that whenever their business connections terminated, then in adjusting the matters between them the value of the real estate in which they were interested under the contract was to be determined by mutual agreement, if they should be able to agree, and the interest of each in the several pieces of property computed on the basis of such agreed valuation; and if they could not agree upon the value of any piece of such real estate, then the value should be determined in some other manner, and the several interests of the parties computed on the basis of such value, so determined, and that Bissell was then at liberty to retain such real estate, free from any lien of Grinton, by first making payment to Grinton of his interest therein under the contract, as computed on such valuation at the date of making the same.

Such is the construction of the contract set up in the bill of complainant. That it is the true construction, counsel for appellant contends appears, first, from the language employed in the writing itself, unaided by extrinsic evidence; second, from a consideration of the contract with reference to the situation of the parties, their relation to the subject-matter of the contract and the attendant circumstances existing at the time of its execution; third, from the construction adopted by the parties themselves from its date to the time of Bissell's death; fourth, from acts, statements and admissions of Bissell frequently made after the date of its execution.

The Circuit Court adopted an adverse construction, and, as we understand it, the only substantial error complained of here is the denial to Grinton of the one-fifth of the increase in value of the real estate acquired by Bissell as above indicated, and remaining undisposed of at the time of his death.

We do not deem it necessary to consider in this opinion all the numerous points discussed in the very prolix printed arguments filed, occupying, as they do, over four hundred pages. We shall be content to discuss the leading features of the case.

We think the court was warranted in finding that a full settlement was had between appellant and Bissell on the 8th of February, 1879, when the balance of $151.56 was found to be due appellant. The real controversy, therefore, is confined to the charges contained in the original bill and is dependent upon the construction to be given to the contract of February 8, 1879. Does the construction contended for arise from the language employed in the written instrument itself? Does appellant's equitable lien find an existence there? The language is plain and simple and certainly allows no room for doubt in any part appearing before paragraph seven, which reads as follows:

(7) "In consideration of the party of the second part's faithful performance of the agreements above specified, he is to receive three (3) per cent on all amounts collected for

rents, said rent account to be kept separate from other
transactions; is also to receive from the net income of the
personal capital one-fifth (1-5) of every transaction which
is to be entered in the proper accounts, said accounts to
be balanced on the first of every month, one-fifth of said
balance to be charged to party of the first part and
credited to the party of the second part, and whenever
the party of the second part shall receive any or all of his
interest of the net proceeds realized from the transac-
tions before specified, it shall be upon the check of the
party of the first part."

This paragraph fixes appellant's compensation. While it
is proper that the contract be construed as a whole, yet this
paragraph must contain in substance the construction in-
sisted upon or resort must be had to extrinsic evidence.
The paragraph next following relates only to his compensa-
tion in cases of sale after a mutual valuation, and has no
reference to this one. The ninth paragraph provides for
Grinton collecting up all transactions made by him and
making good to Bissell one-fifth of all losses sustained.
The tenth paragraph provides for Grinton making com-
plete and detailed entries in the books of each transaction,
and limits the payment to him of his claim to the time of
its being paid in. The eleventh and twelfth paragraphs
relate entirely to the incidental business of the office and
the taxes on personal capital employed under the contract.
The next paragraph, which is the only remaining one,
simply provides that the contract may be terminated on
either party giving to the other thirty days' notice.

In paragraph seven there is no semblance of a covenant
that personal capital shall not be merged into real estate,
or if so merged shall retain the character of personal capital
for the purpose of fixing Grinton's compensation or interest
in deals made by him. Neither in this paragraph nor in
any part of the contract appears any agreement that upon
the termination of the contract, the value of such real
estate should be determined by mutual consent or otherwise,
and that Bissell should be allowed to retain it free from any

lien of Grinton only upon payment to Grinton of one-fifth of its increased value. There is nothing in the instrument to show that the parties ever contemplated such a contingency as a termination of the contract with a portion of the personal capital invested in real estate. As to appellant's compensation and share in the business relating to deals on transactions concluded in the lifetime of Bissell, we are satisfied they are so plainly and clearly set forth in the written contract as to preclude any resort to extrinsic evidence. Where a written contract speaks plainly the thought of the parties as to their mutual obligations and rights under it, a resort to extrinsic evidence is unnecessary and improper. Stettauer v. Hamlin, 97 Ill. 312; Bearss v. Ford, 108 Ill. 16. A careful perusal of the contract leaves us in doubt as to but one thing, and that is as to what interest or claim, if any, Grinton should have in real estate resulting from personal capital undisposed of on the termination of the contract.

To aid appellant in his construction he introduced in evidence the books of account kept by him, a book identified as the "statement book," a paper signed by Bissell on the 18th of August, 1887, whereby he stipulated that a certain deed executed by Grinton on that day to a certain lot in Joliet should not have the effect of defeating any interest which Grinton had in the property, and the testimony of Grinton, Vose and Hunter of statements and declarations made by Bissell in conversations had with them.

Before considering this extrinsic evidence we deem it proper to say that we are not inclined to the opinion that the written contract created the relation of copartners between Bissell and Grinton, but are disposed to regard it as a contract of employment. Nor are we disposed to regard this question as a controlling one in the case, because if there was any such understanding and agreement with reference to the determination of appellant's claim or interest in the real estate acquired by personal capital as is set forth in the bill of complaint, appellant was entitled to the relief sought, even though the relation was that of employer and

employe.   The importance of the question arises in considering the books of account kept by Grinton and offered in evidence.   It is a well established doctrine that partnership books of account, kept during the continuance of the copartnership, are evidence for and against the different members of the firm in subsequent litigation between them.   The books are presumed to contain a true history of the business, and a true record of the transactions between the partners.   The reason which supports the rule is that the books are at all times open to the inspection of the individual partners and that they are considered as having acquiesced in the various entries made.   While the books of account are proper as evidence in a suit for a partnership settlement, we apprehend the chancellor in deciding to what extent the entries and recitals made therein by one partner shall bind the other, will be governed largely by the peculiar circumstances of the case.   He certainly would make a difference in the case of an active, intelligent business man, in the prime of life, from that of an uneducated man, burdened with the infirmities of extreme old age.   It should be borne in mind that the introduction of the books in this case was for the purpose of aiding a proper construction of the contract, to ascertain Bissell's understanding and interpretation of the agreement.   The entries were made by Grinton himself; they contained no word from the hand of Bissell; they show no affirmative act on his part.   They are of no value as indicating Bissell's understanding of the contract, except where it is shown that the entries were brought specifically to his notice.   To support his construction of the contract, appellant showed by the books that the account with each piece of real estate acquired after the contract, was kept separately, so as to show at all times the actual investment of personal capital therein, and that all sales of real estate showing gain, were carried to discount and divided, one-fifth to Grinton and four-fifths to Bissell.   Each piece so acquired was debited with first cost and each subsequent item of expense, such as taxes, repairs, etc.   It was credited with receipts of rent, if any.   The balance constituted the in-

vestment of personal capital. If sold above the investment and expense, the excess was claimed as "income" under paragraph seven of the contract, to be divided one-fifth and four-fi hs respectively.

To be of much value to appellant as showing a mutual interpretation of the contract, this system of bookkeeping should be directly traceable to the contract and should apply to realty acquired after February 8, 1879. The evidence shows that this system of bookkeeping had been adopted by Grinton long before the contract of February 8, 1879, and was applied to all real estate acquired and held by Bissell. Bissell had but little, if any, personal knowledge of entries made by Grinton after they began operating under this contract. Seventy-seven years of age at its date and eighty-six years of age at his death, he was in his dotage. He was illiterate, and ignorant of accounts, and an inspection of the books by him would have given him but little understanding of their contents. His knowledge of the manner in which the books were kept was necessarily confined to what was told him by Grinton, Vose, Hurlbut and Hunter.

Counsel for appellant place great reliance on what is known as the "statement book." The entries made therein were made chiefly by an accountant named Hurlbut, whom Bissell employed a few months before his death to overhaul Grinton's books and make statements of the accounts. There were some entries made by both Hunter and Vose, but those which are at all pertinent to the particular question involved, appear in the handwriting of the accountant, Hurlbut. None were made by Bissell. It is headed "Schedule of real estate and personal estate of Martin C. Bissell, February 8, 1877." Then follows a description of such property of that date. On page 79, which is a part of the statement for that date, is an entry showing how profits and losses of transactions prior to that date were to be divided. Being of the same date as the contract and relating to prior transactions, they are not valuable as aiding a proper construction of the contract. Then follow statements of the

property on hand July 1, 1881, March 1, 1884, February 18, 1884, and October 3, 1887. On page 136 is the following entry : " All profits or losses on the following real estate to be divided as follows, to wit: M. C. Bissell, four-fifths; Wm. Grinton, one-fifth; the Al. Stevens lots, see inv. July 1, '81; the Smith Lawrence lots, see inv. July 1, '81; the L. K. Stevens lots, see inv. July 1, '81."

This book is nothing more than a compendium of the account books kept by Grinton. It was made up in Grinton's office and from those books. Considering Bissell's extreme age and the infirmities under which he was laboring at the time, we are not disposed to consider the entries made therein as indicating his interpretation of the contract.

The instrument signed by Bissell on the 18th of August, 1887, was executed under peculiar circumstances. The property described in it was worth $30,000. A foreclosure decree had been rendered against it and a sale had thereunder in August, 1880. There was no redemption, and Bissell was entitled to a master's deed in November, 1881. It was Grinton's duty under the contract to see that such deed was obtained. He failed to do so and allowed the statute of limitations to run against the execution of a master's deed. Owing to his age and infirmities, Bissell was at that time giving but little attention to such matters. He relied entirely upon Grinton. He supposed the deed had been procured and the title to the property in himself. When he discovered that such was not the case and that the title was in Grinton, who had obtained a quit-claim deed to himself, the old man's state of mind can well be imagined. In such a condition of things it is not at all strange that Grinton and his attorney were able to procure from him the instrument of August 18, 1887, as the condition upon which Grinton would convey the property to him. We are disposed to give it but little weight, as evincing Bissell's interpretation of the contract.

The other extrinsic evidence relied upon is found in the testimony of Grinton, Vose and Hunter. They testify to conversations had with Bissell, in which he acknowledged

Grinton's interest in the property as contended for. Appellees insist that neither Grinton nor Vose are competent witnesses. Their testimony was heard subject to objection. Clearly Grinton is not a competent witness. He is complainant in a suit where the defendants are the executors of a deceased person, and comes directly within the provision of section two of chapter fifty-one of the Revised Statutes. Not so with Vose. Although he had a similar suit pending against the executors, and the record shows his strong sympathy with Grinton, he was not so directly interested in this suit as to render him incompetent as a witness. No one can read Vose's testimony without being impressed with the decided leaning of that witness to the cause of Grinton, his friend, and main reliance in his suit. He is flatly contradicted, too, by Miss Weed, a disinterested witness, in a very material part of his testimony. In view of his feeling for Grinton, his contradiction by Miss Weed and connection with the case, we are not favorably impressed with this witness. The substance of the testimony of Hunter, a brother-in-law of Grinton, was that Bissell understood the contract so far as it related to Grinton's interest in real estate arising from personal capital, the same as Grinton did. In the conversations had, Bissell expressed himself as being dissatisfied because Grinton was getting rich too fast under the contract, on account of the rapid advance of real estate in Joliet. He at such times fully recognized Grinton's interest as contended for. His testimony was taken six years after the alleged conversations. While he appears to have retained a very distinct recollection of Bissell's statements regarding Grinton's interest, he has a very indistinct and uncertain recollection as to what particular pieces of real estate were embraced, and of certain missing pages from the "statement book," at that time in his charge for the purpose of making the schedule of March 1, 1884. However, giving to the testimony of Vose and Hunter the greatest credence, it falls far short of establishing that there was an "understanding and agreement between Bissell and Grinton that whenever their business connections were

terminated, then in adjusting the matters between them, the value of the real estate in which they were interested under the contract should be determined by mutual consent, if possible, and if not by mutual consent, then in some other proper manner, and the several interests of the parties computed on the basis of the value then determined, and that Bissell was then at liberty to retain such real estate, free from any lien of Grinton, by first making payment to Grinton of his interest therein, the equitable lien of Grinton to continue to his benefit and security until complete adjustment and payment to him of his interest therein."

The entire extrinsic evidence will be searched in vain for proof of such an agreement. It does not seem to have been contemplated at any time. On the other hand, paragraph ten of the contract provided that Grinton was not entitled to his share of the proceeds of a transaction until paid in, the evident meaning of which was that upon the closing of a transaction and the money being paid in, Grinton was entitled to receive one-fifth of the net proceeds, and not before.

Appellant set up such an agreement in his bill. Without establishing it he was not entitled to the relief sought.

The decree was fully as favorable to appellant as the evidence would warrant.

*Decree affirmed.*